ALISON C., Plaintiff-Appellee, v. DAVID WESTCOTT, Defendant-Appellant.

Second District    No. 2—02—1379

Opinion filed October 20, 2003.

Michael W. Feetterer, of Roth & Feetterer, P.C., of McHenry, for appellant.

Steven J. Brody, of Steven J. Brody & Associates, Ltd., of Crystal Lake, for appellee.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, David Westcott, appeals from the trial court's denial of his motion to dismiss a petition for a plenary order of protection, requesting that he stay away from and not contact plaintiff, Alison C. He argues that the court erred by denying the motion because he and plaintiff were not in a "dating relationship" and, thus, plaintiff was not a person protected by the Illinois Domestic Violence Act of 1986 (the Act) (750 ILCS 60/101 *et seq.* (West 2002)). We reverse.

Plaintiff and defendant are both high school students. In the evening of November 3, 2002, defendant telephoned plaintiff at her home and invited her to lunch the next day. Plaintiff agreed. The following day, plaintiff and defendant met for lunch near the front of the school. They left the school grounds in defendant's car. After driving around for about 10 minutes, defendant informed plaintiff that he did not have any money to pay for lunch and suggested that they "go park somewhere and chill." Defendant then parked his car in a deserted parking lot.

Defendant began to touch plaintiff. Plaintiff tried to pull defendant's hands away but was unable to do so. She repeatedly told him to stop touching her, but, instead, he indicated that he had a gun, sat on top of her, and "touch[ed] [her] breasts and put[ ] his hands down [her] pants." Eventually, plaintiff was able to push defendant away, and he angrily drove them back to the school.

On November 7, 2002, plaintiff petitioned the court for an order of protection from defendant. The court entered an emergency order of protection that day and scheduled a hearing for November 26. The high school removed defendant from plaintiff's classes and placed him in independent study. Plaintiff also pursued criminal charges against defendant.

At the November 26 hearing, defendant orally moved to dismiss the petition (735 ILCS 5/2—619 (West 2002)). As grounds for the motion, defendant argued that, because the parties had gone on only one lunch date, they were not engaged in a "dating relationship" and, therefore, plaintiff was not a person protected by the Act. The court disagreed and, noting that plaintiff's testimony about the incident was uncontroverted, entered the plenary order of protection. Under that order, defendant was to refrain from any contact with plaintiff for two years; however, defendant was permitted to remain at the same school. Defendant appeals.

■ A trial court's decision on a motion to dismiss presents a question of law that we review *de novo*. *Brandt v. Boston Scientific Corp.*, 204 Ill. 2d 640, 644-45 (2003). During our review, we accept as true all well-pleaded facts and their reasonable inferences. In addition, issues requiring statutory interpretation are also questions of law subject to a *de novo* review. *Eads v. Heritage Enterprises, Inc.*, 204 Ill. 2d 92, 96 (2003).

■ The fundamental rule of statutory interpretation is to ascertain and give effect to the legislature's intent. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000). The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469,

479 (1994). Where statutory language is clear, it must be applied as written; however, if the language is susceptible of more than one interpretation, the court may look beyond the language to consider the legislative purpose. *Reda v. Advocate Health Care*, 199 Ill. 2d 47, 55 (2002). Legislative intent must be ascertained from a consideration of the entire act, its nature, its object, and the consequences resulting from different constructions. *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 96 (1990).

■ The Act was designed to prevent abuse and harassment between family and household members. 750 ILCS 60/201(a) (West 2002). Section 103(6) of the Act defines "family or household members" as:

> "spouses, former spouses, parents, children, stepchildren and other persons related by blood or by present or prior marriage, persons who share or formerly shared a common dwelling, persons who have or allegedly have a child in common, persons who share or allegedly share a blood relationship through a child, *persons who have or have had a dating or engagement relationship*, persons with disabilities and their personal assistants, and caregivers as defined in paragraph (3) of subsection (b) of Section 12—21 of the Criminal Code of 1961. For purposes of this paragraph, *neither a casual acquaintanceship nor ordinary fraternization between 2 individuals in business or social contexts shall be deemed to constitute a dating relationship*." (Emphasis added.) 750 ILCS 60/103(6) (West 2002).

The Act was originally enacted in 1986. Pub. Act 84—1305, eff. August 21, 1986. In this initial version, it did not protect persons in a "dating relationship." See Ill. Rev. Stat. 1987, ch. 40, par. 2311—3. This language was added in 1993. Pub. Act 87—1186, eff. January 1, 1993 (amending Ill. Rev. Stat. 1991, ch. 40, par. 2311—3). The Act explains that the phrase "dating or engagement relationship" does not include "a casual acquaintanceship nor ordinary fraternization between 2 individuals in business or social contexts." 750 ILCS 60/103(6) (West 2002).

■ The trial court interpreted the phrase "dating relationship" in section 103(6) of the Act as including the parties' situation, which was limited to a single date. Defendant disagrees, contending that the Act protects only persons who share an intimate, intertwined relationship that could not occur after just one date. The language in question is unclear, and both interpretations are reasonable. Thus, we find the language ambiguous.

When a statute is ambiguous, we may look beyond the language as written to discern the legislative intent and consider the purpose of

the law, the evils that the law was designed to remedy, and the legislative history. *In re B.C.*, 176 Ill. 2d 536, 542-43 (1997). A review of the legislative history does not shed any light on the reason the protections of the Act were extended to persons in a "dating relationship." Nevertheless, the Act instructs us that it "shall be liberally construed and applied to promote its underlying purposes." 750 ILCS 60/102 (West 2002). Among the purposes delineated in the Act is to "[r]ecognize domestic violence as a serious crime against the individual and society which produces family disharmony in thousands of Illinois families, promotes a pattern of escalating violence which frequently culminates in intra-family homicide, and creates an emotional atmosphere that is not conducive to healthy childhood development." 750 ILCS 60/102(1) (West 2002). In other words, the Act was created to prevent abuse between persons sharing intimate relationships. *Glater v. Fabianich*, 252 Ill. App. 3d 372, 376 (1993).

Because one of the purposes of the Act is to prevent abuse between persons involved in *intimate* relationships, we cannot agree with the trial court's conclusion that the parties' one date established a "dating relationship" under the Act. In addition to the Act's stated purpose, we find support for this resolution in *Oriola v. Thaler*, 84 Cal. App. 4th 397, 100 Cal. Rptr. 2d 822 (2000). While considering a similar issue, the *Oriola* court extensively examined what types of dating relationships are encompassed by other states' domestic violence protection statutes (DVPS). *Oriola*, 84 Cal. App. 4th at 410-11, 100 Cal. Rptr. 2d at 831-32. For instance, in Massachusetts, that state's DVPS covers persons involved in a "substantive dating or engagement relationship," as determined by such factors as the amount of time the parties were involved in the relationship and the frequency of their interaction. Mass. Gen. Laws ch. 209A, § 1(e) (2003). Similarly, Rhode Island's DVPS applies factors similar to those listed above to protect persons engaged in a "substantive dating or engagement relationship within the past one year." R.I. Gen. Laws § 8—8.1—1(3) (Supp. 2002). Moreover, in Montana, persons in a "dating or ongoing intimate relationship with a person of the opposite sex" may seek the protection of that state's DVPS. Mont. Code Ann. § 45—5—206(2)(b) (2002).

The *Oriola* court found these statutes' definitions of a "dating relationship" instructive for determining what the California legislature intended that phrase to mean in its DVPS. *Oriola*, 84 Cal. App. 4th at 411-12, 100 Cal. Rptr. 2d at 832. After considering the various judicial and legislative interpretations of the phrase, it defined a "dating relationship" under California's DVPS as a "serious courtship." *Oriola*, 84 Cal. App. 4th at 412, 100 Cal. Rptr. 2d at 832. It further explained:

"[A dating relationship] is a social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual." *Oriola*, 84 Cal. App. 4th at 412, 100 Cal. Rptr. 2d at 832-33.

■ We hold that the Illinois legislature intended for a "dating relationship" under section 103(6) of the Act to refer to a serious courtship, like that discussed in *Oriola*. We believe that requiring a "dating relationship" to be a serious courtship satisfies one of the Act's stated purposes—that a person involved in an intimate relationship should have a legal mechanism to prevent abuse from the other person in that relationship. We recognize that the Act states that its provisions are to be liberally construed. 750 ILCS 60/102 (West 2002). However, the Act also serves a penal purpose, and, as such, it should be strictly construed in favor of the accused. *People v. Carillo*, 323 Ill. App. 3d 367, 372 (2001). Applying a strict construction to this section, we believe that the obvious meaning and general understanding of a "dating relationship" is a serious courtship. Furthermore, as stated in the Act, the ordinary social fraternization between two persons is excluded from the meaning of the phrase "dating relationship." 750 ILCS 60/103(6) (West 2002). This also supports our resolution that the legislature intended that a "dating relationship" be a relationship that was more serious and intimate than casual.

■ Regarding the present situation, the evidence does not show that the parties were engaged in a "dating relationship." The parties attended the same high school, had spoken on the telephone, and went on only a single lunch date. The relationship was brief and not exclusive. Any prospect of a romantic relationship was, in short, quashed at the outset.

As a result, we conclude that the trial court erred by denying defendant's motion to dismiss the petition for a plenary order of protection under the Act. Plaintiff was unable to petition for relief under the Act because the parties' relationship was not a "dating relationship" or other intimate relationship protected by the Act.

The judgment of the circuit court of McHenry County is reversed.

Reversed.

GROMETER and KAPALA, JJ., concur.